No. 2013-1538

# United States Court of Appeals for the Federal Circuit

IN RE KEI ROGER AOKI, MICHAEL W. GRAYSTON, STEVEN R. CARLSON, and JUDITH M. LEON

Appeal from the United States Patent and Trademark Office, Trial and Appeal Board in Serial No. 10/461,829

## APPELLANTS' OPENING BRIEF

Jonathan E. Singer
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
(612) 335-5070

Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

Dated: September 30, 2013

# CERTIFICATE OF INTEREST

Counsel for Appellants certifies the following:

1. The full name of every party or amicus represented by me is: Kei Roger Aoki, Michael W. Grayston, Steven R. Carlson, and Judith M. Leon

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: Allergan, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

FISH & RICHARDSON PC: Jonathan E. Singer, J. Patrick Finn III, and Craig E. Countryman

ALLERGAN, INC.: Ted A. Chan; Stephen Donovan

COZEN O'CONNOR: Quan L. Nguyen

Dated: September 30, 2013

/s/ *Craig E. Countryman*
Craig E. Countryman

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTEREST .......... i

STATEMENT OF RELATED CASES .......... iv

STATEMENT OF JURISDICTION .......... v

STATEMENT OF THE ISSUE .......... vi

STATEMENT OF THE CASE .......... 1

STATEMENT OF THE FACTS .......... 2

A. The Prior Art Taught Only Using Complexed Botulinum Toxin to Treat Medical Conditions in Humans. .......... 2

B. There Were No Reports that the Uncomplexed Toxin Would be Effective in Humans, and the Prior Art Discouraged Its Use. .......... 3

C. The Claimed Invention .......... 6

D. Proceedings in the Patent Office. .......... 7

SUMMARY OF THE ARGUMENT .......... 14

ARGUMENT .......... 15

I. Standard of Review 15

II. The Board's Obviousness Finding Was Legally Erroneous. 15

A. It Was Not Obvious for the Skilled Artisan to Pursue a Path the Prior Art Taught Was "Not Practical for Medical Applications." .......... 15

B. The Board's Contrary Conclusion Was Based on Hindsight and Applying the Wrong Legal Standard for Teaching Away. .......... 22

CONCLUSION .......... 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alza Corp. v. Mylan Laboratories, Inc.*,
391 F.3d 1365, 1372-73 .......... 19

*Crocs, Inc. v. International Trade Comm'n*,
598 F.3d 1294, 1308 (Fed. Cir. 2010) .......... 19

*Ecolochem, Inc. v. Southern California Edison Co.*,
227 F. 3d 1361, 1373-74 (Fed. Cir. 2001) .......... 19

*In re Bell*,
991 F. 2d 781, 784 (Fed. Cir. 1993) .......... 19

*In re Cyclobenzaprine*,
676 F.3d 1063, 1075 (Fed. Cir. 2012) .......... 20

*In re Gal*,
980 F.2d 717, 720 (Fed. Cir. 1992) .......... 16

*In re Gurley*,
27 F.3d 551, 553 (Fed. Cir. 1994) .......... 18, 23, 24

*In re Klein*,
647 F.3d 1343, 1347 (Fed. Cir. 2011) .......... 15

*In re NTP*,
654 F.3d 1279, 1299 (Fed. Cir. 2011) .......... 22

*Leo Pharm. Prods., Ltd. v. Rea*,
__ F.3d __, 2013 WL 4054937, at *6 .......... 15, 21, 25

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372, 1379 (Fed. Cir. 2012) .......... 22

*Monarch Knitting Machinery v. Sulzer Morat GmbH*,
139 F.3d 877, 885 (Fed. Cir. 1998) .......... 19, 20

*Rambus, Inc. v. Rea*,
__ F.3d __, 2013 WL 5312505, at *6 (Fed. Cir. Sept. 24, 2013) .......... 16, 25

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Unigene Labs, Inc. v. Apotex, Inc.*,
655 F.3d 1352, 1360 (Fed. Cir. 2011) ........................................................ 16, 18

*United States v. Adams*,
383 U.S. 39, 51-52 (1966) ........................................................................ 18, 23

**STATEMENT OF RELATED CASES**

Pursuant to Fed. R. App. P. 47.5, counsel for Appellants states that there has been no prior appeal to the Federal Circuit in this proceeding. There are presently no other cases in this or any other court known to directly affect or be directly affected by the Court's decision in this appeal.

# STATEMENT OF JURISDICTION

This is an appeal from a final decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office. The Board issued its final decision on April 30, 2013. (A1-10.) Appellants timely filed a notice of appeal on June 19, 2013, within the 60 day time limit set by 35 U.S.C. § 142 and 37 C.F.R. § 90.3. (A2587.) This Court therefore has jurisdiction over this appeal under 35 U.S.C. § 141(a) and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

Whether Appellants' method of treating involuntary eyelid twitching in humans using a therapeutically effective amount of uncomplexed *botulinum* toxin would have been obvious to the skilled artisan at the time of invention where:

i) the only prior art reference addressing potential use of the uncomplexed toxin in humans, which was published just a year before the invention date, described it as "not practical in medical applications" and "unlikely to be used in a clinical setting,"

ii) the prior art suggested no reason to modify prior art treatment methods, which used a form of the toxin that was complexed to other proteins, and

iii) the prior art discussing the effect of the uncomplexed toxin on rats, which was the basis of the Board's obviousness rejection, existed for over a decade before the invention date without anyone attempting to pursue the claimed invention.

**STATEMENT OF THE CASE**

This appeal involves a patent application with a complicated history that has been distilled to a single issue. Appellants invented a unique method of treating humans afflicted with blepharospasm—abnormal eyelid twitching—by administering a neurotoxin derived from the *Clostridium botulinum* bacteria. (A2177-78.) The prior art taught treating eyelid twitching in humans with a form of the toxin in which it was complexed to other proteins. (A2500-08.) Other prior art reported that a purified form of the toxin, in which it was not complexed to anything else, induced paralysis in the hind leg of rats. (A2510-17.) But no one tried to use the uncomplexed form of the toxin to treat any muscle disorder in humans for over a decade following this report. And, by 1992, the year before the invention, the leading scientist in the field published a review describing the uncomplexed toxin as "not practical for medical applications" and "unlikely" to be used "in a clinical setting." (A2481, A2488.) Proceeding contrary to this conventional wisdom, Appellants devised a treatment method for using the uncomplexed toxin to treat eyelid twitching in humans, and they filed a patent application that disclosed this treatment method in late 1993.

The claims on appeal seek patent protection for this invention. After years of proceedings, recounted further below, the PTO withdrew all but one ground of rejection—obviousness based on a single combination of references. (A2546-49.) The Board affirmed that rejection based on a legally erroneous analysis of the undisputed content of the prior art. (A1-10.) This appeal followed.

## STATEMENT OF THE FACTS

### A. The Prior Art Taught Only Using Complexed Botulinum Toxin to Treat Medical Conditions in Humans.

This case involves use of a poisonous substance to successfully treat a disease in humans. The *clostridium botulinum* bacterium produces a toxic protein that can induce paralysis and death. (A2479-80.) The toxin causes paralysis by disrupting the release of a chemical in the nervous system (acetylcholine), which is necessary to activate muscle movement. (A2479, A2502.) This paralysis can be so complete that it causes death by stopping movement of the muscles needed to breathe. (*Id.*) Some sad examples of this phenomenon occur when humans eat food that is contaminated with *clostridium botulinum* bacteria and thus contract "botulism," a rare illness which results in paralysis of certain muscle groups, or, in severe cases, death. (A2510.) Different varieties of the *clostridium botulinum* produce different versions of the toxin, which are classified as types A through G. (A2480.) The type A toxin is the most deadly, and it produces the longest lasting effects. (*Id.*)

Scientists have harnessed the power of this poisonous substance to treat a variety of human diseases involving involuntary muscle spasms. These disorders included crossed eyes (strabismus), spasmodic eye closure (blepharospasm), and facial twitching (hemifacial spasm). (A2479-80.) After decades of research, they were able to develop formulations that could be directly injected into the problematic muscle and cause a limited paralysis there, which would address the disease without causing

toxic symptoms throughout the rest of the body. (*Id.*) The FDA approved botulinum toxin type A for treatment of strabismus, hernifacial spasm, and blepharospasm in 1989, and Allergan began selling it under the trade name "BOTOX®." (A2479, A36.)

These treatments all used a "complexed" form of the toxin, in which it is bound to other molecules. The toxin is a protein, and, when isolated from the *botulinum* bacterium, it is bound to other bacterial proteins that are sometimes referred to as "haemagglutinin" molecules. (A2510.) One exemplary prior art reference that discusses using the complexed form of the toxin to treat blepharospasm in humans is U.S. Patent No. 5,183,462 to Borodic, which was filed in August 1990 and issued in February 1993. (A2500-08.) The Borodic patent warned, however, that the toxin "is believed to be the single most toxic material known." (A2502.)

### B. There Were No Reports that the Uncomplexed Toxin Would be Effective in Humans, and the Prior Art Discouraged Its Use.

There was no prior art suggesting that the uncomplexed toxin could (or should) be used as a medical treatment in humans. The only prior art examining the biological activity of the uncomplexed toxin at all were studies showing it could induce paralysis or heart failure in animals. (A2510-17; A2416-30.)

An example of this prior art was a 1982 article by Tse et al. (A2510-17.) Tse was investigating the uncomplexed toxin not for potential use as a treatment for muscle twitching disorders, but so it could be used (1) to create a "superior and novel vaccine" to counteract the poisonous effects of the toxin, (2) to screen for the

presence of the botulinum complexes "in clinical specimens and foodstuffs," and (3) to investigate the "nerve membrane components(s)" associated with the release of neurotransmitters at nerve synapses.  (A2510.)  As part of this research, Tse reported that the uncomplexed toxin caused paralysis when injected into the hind leg of rats. (A2510, A2515.)

Another example was a 1988 article by Lamanna.  (A2416-30.)  The Lamanna article expressed concern that "[l]ittle attention has been paid to the occurrence of cardiac effects caused by botulinal toxin."  (A2416.)  It was therefore investigating the effects of the complexed and uncomplexed toxin on the heartbeat of mice, rats, rabbits, and dogs.  (A2416-17.)  Lamanna found that a solution of the uncomplexed toxin was stable at pH 6.2-6.7, (A2417), and that it slowed the heartbeat of those animals and was more potent than the complexed toxin.  (A2419.)

But neither article suggested that using the uncomplexed toxin as a treatment for any muscle spasm disorder in humans, much less for blepharospasm.  Instead, the prevailing wisdom—reflected in a 1992 review article co-authored by Dr. Edward Schantz—was that the uncomplexed toxin was not practical for human medical use. (A2479-98; A2086-88.)   Dr. Schantz was the leading authority at the time regarding use of the *clostridium botulinum* toxin, having worked with the toxin for over 48 years. (A2087.)  Indeed, "every dose [of the toxin] ever administered by a doctor," as of 1992, "was made by Schantz."  (*Id.*)

Dr. Schantz's article is the only record evidence addressing use of the uncomplexed toxin in humans. Its discussion begins by noting that the complex between the toxin and the haemagglutinin proteins is important to preserving the toxin's shape and, thus, its biological activity:

> The biological activity (toxicity) of the toxin, like many other biologically active proteins, is due to the spatial or conformational structure of the neurotoxin molecule. The nontoxic [haemagglutinin] proteins bound to the neurotoxin apparently play an important role in maintaining the toxic shape of the neurotoxin. Careful handling of purified [uncomplexed] toxin is therefore important for maintenance of stability.

(A2481.)

The article then describes the neurotoxin's stability (or lack thereof) in a variety of conditions. (*Id.*) It observes that the uncomplexed toxin can be stabilized in more acidic formulations that include other proteins, as had been noted previously by Lamanna, but nevertheless concludes that the uncomplexed toxin "is not practical for medical applications" because it is unstable when the pH is raised:

> Dilution to extremely low concentrations (nanograms per milliliter) also tends to decrease the stability of the neurotoxin, but this can be prevented by diluting with a buffered solution (at pH 6.8 or below) containing another protein. . . . When the pH is raised above 7.3, the neurotoxin is liberated, which is very labile. Because of its lability the neurotoxin is not practical for medical applications.

(*Id.*)

A later part of the Schantz article repeats the authors' skepticism that the uncomplexed toxin can be used to treat medical conditions in humans. (A2488.) It explains that it is "unlikely" the uncomplexed toxin "will be used in a clinical setting,"

adding that, although the uncomplexed toxin can be stored, it is "inactivated" by the dilution, formulation, and drying steps needed to use it clinically:

> **Clinical use of pure neurotoxin compared with toxin complexes.** Most recent information concerning the structure and pharmacology of botulinum toxin has been obtained with purified neurotoxins, but it is unlikely that these will be used in a clinical setting. The toxin complexes are much more stable than neurotoxins and can be diluted and formulated with retention of toxicity. Pure neurotoxins can be kept for several weeks to months in solution in the cold but are inactivated on dilution, formulation, and drying.

(*Id.*, emphasis in original.)

Schantz made all these statements despite being fully aware of prior art reporting the uncomplexed toxin's biological activity in animals, including the 1982 Tse article and 1988 Lammana article, both of which it cites. (A2497 n. 222, A2495 n.114; A; A2088.) Nevertheless, Schantz specifically notes that "[n]o clinical trials on primates have been performed with purified neurotoxins." (*Id.*)

### C. The Claimed Invention

It was against this backdrop of prior art that the Appellants filed their original patent application in December 28, 1993. The PTO does not dispute that Appellants' application was the first to describe using the uncomplexed toxin for treating a variety of medical conditions in humans, including blepharospasm. Appellants have since filed many other applications with priority to the 1993 application and have claims directed to various aspects of the invention disclosed there. Several have become issued patents. *See, e.g.*, U.S. Patent No. 6,974,578. The current application is a continuation-in-part of the initial application, and it was filed in 2003. (A33.) The

PTO has determined the claims on appeal are entitled to the December 1993 priority date. (A2057-59.)

The claims on appeal cover treatment methods that use the uncomplexed toxin, which they refer to as the "neurotoxic component," to treat blepharospasm in humans. The claims specifically require that the method is a "human medical application," a limitation that was added during prosecution to make clear the Appellants were claiming the very type of treatment that Schantz cautioned against. Claims 2, 4-6, 16, 17, 24, and 25 of the application are at issue on appeal. Claim 2 is representative and reproduced below:

> 2. A method for treating blepharospasm,
>
> wherein said method is a human medical application and comprises the step of administering to a human patient a therapeutically effective amount of the neurotoxic component from a single serotype of a botulinum toxin, to thereby treat the blepharospasm,
>
> wherein the neurotoxic component administered to the patient has a molecular weight of about 150 kilodaltons.

(A2177.) The other claims include further limitations regarding the serotype, amount, or administration of the uncomplexed toxin. (*Id.*)

### D. Proceedings in the Patent Office.

#### 1. The Prosecution Leading Up to the Board's Decision on Appeal Distills to a Single Obviousness Rejection.

The application has a long history within the Patent Office. We provide a condensed summary, as most of the details are irrelevant to the issue now on appeal.

Appellants initially filed the application in June 2003 as a continuation-in-part that claimed priority back to the original December 1993 application. (A33-55.) After several years of back and forth, the examiner entered a final rejection in December 2007 finding that (1) the pending claims were not entitled to the December 1993 priority date, and (2) the pending claims would have been obvious as of 2003. (A891-901.) The examiner denied priority because he didn't think the application would have enabled one skilled in the art to practice the invention in 1993, given the disclosure of the Schantz article:

> Applicants knew, at the time of filing [in December 1993], that the state of the art was that of Schantz. Yet Applicants [sic] disclosure neither disclosed nor implied that pure toxin was clinically ineffective, as taught by Schantz. . . . As indicated by Schantz et al. the teachings of the complexed toxin cannot be utilized [with] purified botulinum toxin since the purified potion is so labile that it would not be used in clinical settings.

(A897.) The examiner thus gave the claims a 2003 priority date, and then rejected them based on combinations of references that included intervening articles published between December 1993 and June 2003. (A898-901.)

Appellants responded by submitting a request for continued examination, along with a declaration by Dr. Leonard Smith. (A907, A908-18.) Dr. Smith is an expert with "extensive experience characterizing and formulating the neurotoxic component of a botulinum toxin" beginning in "about 1985," years before the earliest priority date. (A909.) He explained that Appellants' application would have enabled the skilled artisan to make and use the claimed invention as of December 1993 and that

the application would have demonstrated the contrary statements in the Schantz article were "clearly wrong." (A912-18.) Appellants used the declaration to argue that, although the Schantz article taught away from the claimed invention for purposes of an obviousness analysis, it did not show a lack of enablement because these are two different legal analyses. (A1295-1317.) The examiner maintained his rejections despite these arguments, (A1476-88), precipitating an appeal to the Board in June 2008.

The Board decided the initial appeal in October 2011. (A2050-64.) The Board agreed with Appellants that they were entitled to a December 1993 priority date, rejected the examiner's contrary enablement analysis, and thus found that all the post-December 1993 references were not prior art. (A2057-59.) But the Board rejected the pending claims as obvious based on the combination of the 1993 Borodic patent and the 1982 Tse article, along with several other combinations. (A2059-67.) The Board recognized, however, that it was entering a new rejection because the obviousness analysis could be "very different" from the perspective of a skilled artisan in 1993 than it was for a skilled artisan in 2003—the time frame the examiner had previously been using. (A2063.) So it remanded to the examiner to allow Appellants to amend their claims and submit new evidence, if they desired. (A2064.)

Appellants pursued both options. They amended their claims to make clear that the claimed treatment method for the uncomplexed toxin was in "a human medical application," to reinforce the difference between their method and prior art

dealing with the effect of the uncomplexed toxin in rats and other animals, a difference commented upon in the Schantz article's caution that use of the uncomplexed toxin was not practical for "medical applications." (A2066-67; A2481.) Appellants also submitted a supplemental declaration from Dr. Smith, explaining that Schantz taught away from the claimed invention. (A2086-88.) Dr. Smith explained that, without the benefit of the Appellants' specification and other articles that were no longer prior art, the skilled artisan in December 1993 would not have thought that Schantz's discussion was "clearly wrong." (A2086.) Therefore, Dr. Smith concluded that Schantz would have "discouraged" the skilled artisan from using the uncomplexed neurotoxin at the time of the invention:

> In fact, it is my opinion that a person having ordinary skill in the art reading Schantz 1992 and considering the Tse *et al.* reference and any of the primary references cited in current rejections for the above-referenced Applications (e.g., the Balkan reference) with or without consideration of the Lamanna references clearly would have been discouraged from using the neurotoxic component for human therapeutic purposes.

(A2086-87.)

Dr. Smith gave several reasons why the skilled artisan, reading the prior art as a whole, would have been discouraged from pursuing the claimed method:

- Schantz was published years after Tse and Lamanna, giving Schantz et al. "the benefit of either an additional ten years or an additional four years of research from which to base their teachings." (A2087.) Therefore, the skilled artisan would view Schantz "as being much more authoritative." (*Id.*)

- Dr. Schantz was a giant in the field, having "spent 48 years conducting research and development on botulinum neurotoxins," and having made "every dose [of

the toxin] ever administered by a doctor" as of that time. (A2087.) The skilled artisan would thus have "appreciated that the Schantz 1992 reference is much more authoritative and influential than prior art such as the Tse *et al.* reference and the Lamanna references." (A2087-88.)

- Schantz cited both the 1982 Tse and 1988 Lamanna articles, yet still concluded that the uncomplexed toxin was "not practical for medical applications" and was "unlikely" to be "used in a clinical setting," despite being aware of those teachings. (A2088.)

Despite these submissions, the examiner maintained the obviousness rejections based on several prior art combinations and entered a final rejection in January 2012. (A2127-47.) This precipitated a second appeal to the Board, during which the examiner withdrew all but one of the obviousness rejections—obviousness based on the combination of the 1993 Borodic patent and the 1982 Tse article. (A2546-49.)

#### 2. The Board's Decision Currently on Appeal.

The Board affirmed the rejection of the pending claims as obvious based on Borodic and Tse. (A1-10.) The Board started with the examiner's obviousness case—namely, that the skilled artisan would have taken Borodic's teaching that blepharospasm could be treated in humans using the complexed toxin, and then substituted the uncomplexed toxin from the 1982 Tse article. (A6.) The Board did not identify a reason why the skilled artisan would have sought to modify Borodic's treatment method in this manner. (*Id.*) The Board then turned to Appellants' argument that Schantz teaches away, observing that it "is supported by declarant Dr. Leonard A. Smith." (A6-7.) The Board observed that "weight ought to be given to a

persuasively supported statement of one skilled in the art," adding that "[a]ccordingly, we have carefully considered Dr. Smith's declarations." (A8.)

The Board nevertheless concluded that "we do not agree that Schantz teaches away" because "we do not agree that anything in Schantz would have led one of ordinary skill in the art to expect that the purified neurotoxin would be ineffective in treating blepharospasm." (A9.) The Board acknowledged that "one of ordinary skill in the art would have concluded from the Schantz reference that the purified toxin is impractical in comparison with the complexed toxin," but noted that "Schantz also teaches that the purified neurotoxin can be stored for weeks in the cold, and can be successfully diluted with careful buffering and handling." (*Id.*) But the second part of this statement is incorrect—Schantz expressly states that the pure neurotoxin is inactivated when one takes it out of cold storage and attempts to dilute it: "Pure neurotoxins can be kept for several weeks to months in solution in the cold but are inactivated on dilution, formulation, and drying." (A2488.)

The Board next remarked that when "prior art contains apparently conflicting references, the Board must weigh each reference for its power to suggest solutions to an artisan of ordinary skill," (*id.*, quoting *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991)), and noted that a "known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use." (A9, quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).) But there was no conflict among the prior art here—Schantz cited the earlier references dealing

with the effect of the purified neurotoxin in rats and other animals, but explained that its instability made it unsuitable for use in humans.  (A2481, A2488, A2497 n.222, A2495 n.114; A2086-88.)  And the statements in Schantz went beyond suggesting that use of the purified neurotoxin would be "somewhat inferior" to use of the complexed toxin.

The Board ultimately affirmed the obviousness rejection, explaining that it was "not persuaded that one of ordinary skill in the art would have been dissuaded from substituting the neurotoxic component of botulinum toxin for the larger, more immunogenic haemagglutinin-complexed form of the toxin in Borodic's method of treating blepharospasm."  (A9.)  But this statement would seem to shift the burden of proof to Appellants to identify a reason not to combine the prior art rather than putting the burden on the agency to identify a reason to combine.

This appeal followed.

## SUMMARY OF THE ARGUMENT

This case presents a legal issue.  The underlying facts are mostly undisputed—everyone agrees what Borodic, Tse, and Schantz say, and when they said it.  The real question is the legal effect of these undisputed facts.  There are at least three reasons why the claims are not obvious when the proper legal standard is applied.

First, there was no prior art suggesting the uncomplexed toxin should be used to treat a muscle spasm disorder in humans.  The Board identified no reason why the skilled artisan would have done so, instead seeming to shift the burden to Appellants to come forth with a reason not to modify the prior art.  This was legal error.  Moreover, the neurotoxin is the "single most toxic material known," making the skilled artisan unlikely to tinker with existing treatment methods without a reason.

Second, the only prior art discussing potential use of the uncomplexed toxin in humans—Schantz—said it was "not practical" and "unlikely to be used in a clinical setting."  This shows both teaching away and skepticism of the leading expert in the field.  The Board did not question the correctness of the statements in Schantz, but instead downplayed them by applying an overly strict standard for teaching away.

Third, the progression of the prior art is strong objective evidence of non-obviousness.  Tse existed for a decade before the invention, yet no one tried to apply it in the manner the Board thought would be obvious.  In fact, Borodic, which was written years after Tse, continued to advise using the complexed toxin.  And Schantz cautioned against the invention just a year before the priority date, despite citing Tse.

# ARGUMENT

## I. Standard of Review

Obviousness is a question of law that is based on several underlying factual findings, including "(1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt need, and the failure of others." *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

This Court reviews "the Board's ultimate determination of obviousness *de novo* and the Board's factual findings underlying that determination for substantial evidence." *Id.* When, as here, the key question is how to apply the law of obviousness to the undisputed content of the prior art, this Court is faced with a question of law it reviews *de novo*. *Leo Pharm. Prods., Ltd. v. Rea*, __ F.3d __, 2013 WL 4054937, at *6 ("[A]t bottom, this court confronts a question of law: whether, in light of the prior art references and objective indicia of nonobviousness, the claimed invention would have been obvious to a person of ordinary skill in the art at a time just before the time of invention.").

## II. The Board's Obviousness Finding Was Legally Erroneous.

### A. It Was Not Obvious for the Skilled Artisan to Pursue a Path the Prior Art Taught Was "Not Practical for Medical Applications."

It was not obvious to the skilled artisan to use the uncomplexed toxin to treat blepharospasm in humans, as claimed. The state of the art at the time of invention

was exemplified by the Borodic patent, which taught treating the disease with the complexed toxin. (A2502; A4.) No prior art suggested using the uncomplexed toxin to treat blepharospasm in humans, or gave any reason why the skilled artisan should do so. Indeed, the only reference (Tse) that the Board relied upon for the proposition that the uncomplexed toxin could be used to treat blepharospasm in humans, (A6), was directed to a different purpose—designing vaccines and screening mechanisms to prevent botulinum poisoning. (A2510.)

"Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Unigene Labs, Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (affirming summary judgment of non-obviousness). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.* The burden is on the Board to articulate a reason why the skilled artisan would have combined the prior art to arrive at the claimed invention, rather than the applicant to show the absence of such a reason. *Rambus, Inc. v. Rea*, __ F.3d __, 2013 WL 5312505, at *6 (Fed. Cir. Sept. 24, 2013). And the absence of any reason to modify the prior art to arrive at the claimed invention thus strongly supports a legal conclusion of non-obviousness. *See, e.g., In re Gal*, 980 F.2d 717, 720 (Fed. Cir. 1992) (reversing an obviousness rejection where there was no explanation why one would modify a prior art semiconductor chip to

arrive at the claimed invention). That is especially true for the claims here because, at the time of invention, the neurotoxin was "believed to be the single most toxic material known." (A2502.) So it is unlikely anyone would have tinkered with what form of it was used to treat blepharospasm in humans without a good reason.

Against this backdrop, the Schantz article is particularly powerful evidence of non-obviousness. It is the only prior art that addressed the possibility of using the uncomplexed toxin in humans. It expressly cites the earlier report by Tse that the uncomplexed toxin caused paralysis in rats. (A2497 n.222.) And it alludes to ways in which the stability of the uncomplexed toxin might be improved. (A2481.) Yet, despite knowing about this prior art, Schantz concludes the uncomplexed toxin "is not practical for medical applications," (A2481), and that it "is unlikely" to be "used in a clinical setting." (A2488.) Schantz was published in 1992, just before the 1993 invention date, and it is the best evidence of what someone at that time actually thought of the claimed invention. (A2088.) Moreover, Dr. Schantz was a leader in the field—he had worked with the toxin for nearly five decades and was the source of every dose of the toxin that have ever been administered to a human. (A2087-88.) He was someone of extraordinary skill in the art. If even Dr. Schantz thought the uncomplexed toxin was "not practical for medical applications," then one of only ordinary skill would have had even less hope that it could succeed.

The Schantz article thus demonstrates non-obviousness for two reasons. First, it meets the proper legal standard for teaching away from the claimed invention. "A

reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "[I]n general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Id.*

The statements in Schantz fit these descriptions to a tee. Appellants amended their claims to specify that their treatment method is "a human medical application," (A2066, A2177), and the claims require application of a "therapeutically effective amount" of the uncomplexed toxin. Schantz says that uncomplexed toxin "is not practical for medical applications," (A2481), and Dr. Smith's declaration concludes from this that "Schantz 1992 clearly discourages the use of the neurotoxic component for human therapeutic purposes." (A2451.) The Board found that the skilled artisan would have accepted that use of the uncomplexed toxin was "impractical in comparison with the complexed toxin," (A9), and did not question Dr. Smith's conclusion that it would "discourage" use of the uncomplexed toxin.

This undisputed evidence constitutes teaching away under the proper legal standard, as prior cases from the Supreme Court and this Court demonstrate. *See, e.g., United States v. Adams*, 383 U.S. 39, 51-52 (1966) (finding non-obviousness in part because the prior art taught the approach that led to the claimed invention was "not practical"); *Unigene Labs.*, 655 F.3d at 1363 (finding a prior art reference taught away

from use of several potential stabilizing agents where they yielded "discouraging" test results and reported that only a different ingredient was "satisfactory"); *Crocs, Inc. v. International Trade Comm'n*, 598 F.3d 1294, 1308 (Fed. Cir. 2010) (finding the prior art taught away from use of foam shoe straps where it showed foam was "unsuitable" and "out of place"); *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1372-73 (finding the prior art taught away from use of an ingredient as a transdermally delivered drug where the art taught high solubility in water and oil was important, yet the ingredient had low solubility and thus "would not be a good transdermal candidate"); *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F. 3d 1361, 1373-74 (Fed. Cir. 2001) (finding one prior art reference taught away from using carbon where it said another substance, magnetite, "would be more desirable than activated carbon," and finding a second prior art reference taught away where it identified two methods as "practical," neither of which was the claimed approach, and reversing the district court's contrary findings of no teaching away as clearly erroneous); *Monarch Knitting Machinery v. Sulzer Morat GmbH*, 139 F.3d 877, 885 (Fed. Cir. 1998) (holding that a fact-finder could conclude a reference taught away from a particular approach where it stated that it is "not always the case" that such an approach would be beneficial); *In re Bell*, 991 F. 2d 781, 784 (Fed. Cir. 1993) (reversing obviousness rejection and finding a prior art reference taught away where it described the applicant's approach as "counterproductive").

Second, the Schantz article is strong evidence of skepticism in the art, regardless of whether it rises to the level of teaching away. "General skepticism of those in the art—not amounting to teaching away—is also 'relevant and persuasive evidence' of nonobviousness." *Monarch Knitting*, 139 F.3d at 885. Dr. Schantz's views would have carried special weight given his stature in the field, his awareness of all the relevant prior art, the absence of any identified reason to modify existing treatment methods like Borodic to use the uncomplexed toxin, and the fact that his article is the ***only*** prior art that addressed potential use of the uncomplexed toxin in humans. (A2450-52.) Indeed, not only does Dr. Schantz's article stress that the uncomplexed toxin was "impractical" and "unlikely" for human use, (A2481, A2488), it observes that "[n]o clinical trials on primates have been performed with purified neurotoxin." (A2488.) So this is not a case where the prior art contained conflicting teachings regarding whether the uncomplexed toxin could be used in humans. No tests had been run on humans at all, and the only prior art regarding whether the potential for using the uncomplexed toxin in humans was discouraging. In these circumstances, Dr. Schantz's skepticism is, as the objective evidence often is, the "most probative and cogent evidence in the record," *In re Cyclobenzaprine*, 676 F.3d 1063, 1075 (Fed. Cir. 2012), and it demonstrates non-obviousness as a matter of law.

There is also another, independent basis in the objective indicia that demonstrates non-obviousness: the progression of the prior art, and relative timing of the different publications. Researchers had been investigating use of the

complexed toxin to treat human muscular disorders since at least the 1970s. (A2480 (reporting, in 1992, that "[i]nvestigations into the use of botulinum toxin type A for the treatment of hyperactive muscle disorders originated over 20 years ago").) The Tse article, published in 1982, disclosed that the uncomplexed toxin caused paralysis in the hindlegs of rats. Yet the Board did not identify anyone who tried to use (or even suggested using) the uncomplexed toxin to treat human muscle spasm disorders in the 11 years between the Tse article and the 1993 priority date. Instead the prior art at the time of invention continued to use the complexed toxin to treat blepharospasm in humans, as reflected in the Borodic patent. (A2502, A4.) If it had really been so obvious to apply the Tse disclosure and modify the treatment of blepharospasm in humans to use the uncomplexed toxin, then someone in the art would have tried it. The fact that no one did for more than a decade confirms the claimed invention was obvious only in hindsight. *See, e.g.*, *Leo Pharms.*, 2013 WL 4054937, at *7 ("If these discoveries and advances were routine and relatively easy, the record would undoubtedly have shown that some ordinary artisan would have achieved this invention within months of [the prior art disclosures]. Instead this invention does not appear for more than a decade."). That is especially true when the only intervening discussion regarding use of the uncomplexed toxin in human medical applications was the negative remarks in the 1992 Schantz article.

For all these reasons, the claims are not obvious as a matter of law when the proper legal standard is applied to the undisputed disclosures in the prior art.

### B. The Board's Contrary Conclusion Was Based on Hindsight and Applying the Wrong Legal Standard for Teaching Away.

None of the Board's reasoning is sufficient to support its finding of obviousness. The Board started its analysis by assuming the skilled artisan would start with the Borodic patent, and then substitute the uncomplexed toxin of Tse into the human medical treatment in Borodic, without identifying a reason why the skilled artisan would make such a substitution. (A6.) The Board thus fell into the trap of using hindsight—it started with the claimed invention, then worked backward to find the elements in the prior art. That is legally impermissible. "[T]he proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (reversing the Board's obviousness rejection where it was "based on improper hindsight reasoning").

The Board then compounded this error when it turned to consider the Schantz article. The Board found that Schantz did not teach away because it did "not agree that anything in Schantz would have led one of ordinary skill in the art to expect that the purified neurotoxin would be ineffective in treating blepharospasm," (A9), but this statement contains both a legal and a factual error.

The Board's legal error is that a reference can still teach away without explicitly stating the claimed invention will not work. Several different types of less absolute disclosure can constitute teaching away, as shown by the examples cited at p. 18-19. Indeed, the Supreme Court's decision in *Adams* placed great weight on the fact the prior art taught the inventors' approach was "not practical," *see* 383 U.S. at 51-52, which is precisely how Schantz described the claimed invention here—"not practical for medical applications." (A2481.) Likewise, the Court's decision in *Gurley* commented that "a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant," *see* 27 F.3d at 553, language that parallels the plain text of Schantz, which said it was "unlikely that [the uncomplexed toxin] will be used in a clinical setting." (A2488.) It is certainly true that one type of teaching away is prior art that says the claimed invention will not work. Precedent recognizes, however, that other types of evidence also constitute teaching away. So the Board should not have stopped its analysis simply because it thought Schantz stopped short of teaching the uncomplexed toxin would be ineffective.

The Board erred factually because Schantz actually does suggest the uncomplexed toxin would be ineffective in treating blepharospasm in humans. Schantz explains that the toxin's shape is important to its "biological activity," and that the complexed proteins "play an important role in maintaining the toxic shape of the neurotoxin." (A2481.) After explaining that the uncomplexed toxin is "very

liable" (*i.e.*, can lose its shape) in a variety of conditions, Schantz says that "[b]ecause of its lability the neurotoxin is not practical for medical applications." (*Id.*) In other words, the reason the neurotoxin is "not practical" is it may lose its shape (and thus its effectiveness) when exposed to the conditions necessary to administer it to patients. Schantz repeats this point later, explaining the uncomplexed toxin is "unlikely to be used in a clinical setting" because, unlike the complexed toxin, which "can be diluted and formulated with retention of toxicity," the uncomplexed toxin is "inactivated on dilution, formulation, and drying." (A2488.)

These disclosures in Schantz go beyond suggesting, as the Board erroneously believed, that the uncomplexed toxin would merely be "somewhat inferior" to the complexed toxin. (A9.) They suggest that the uncomplexed toxin would lose efficacy in the formulation conditions necessary to treat a human. So Schantz teaches away even under the Board's impermissibly high standard, and the Board's contrary conclusion is not supported by substantial evidence.

The Board concluded with a further legal error, finding the claims obvious because it was "not persuaded" that the skilled artisan "would have been dissuaded from substituting the neurotoxic component" into Borodic's treatment method instead of the complexed toxin. (A9.) This flips the obviousness analysis upside-down by reversing the burden of proof. The onus is on the Board to demonstrate that there was a reason to combine and a "reasonable expectation of success" in light of the prior art, not on the Appellants to show the absence of a reason to combine or

that claimed invention was thought likely to fail. *See, e.g., Rambus*, 2013 WL 5312505, at *6 (reversing an obviousness rejection and finding it was "legal error" for the Board to base its decision on the fact that "Rambus ha[d] not demonstrated that skilled artisans . . . would not have been able to arrive at the broadly claimed invention" and that "Rambus fail[ed] to present evidence that skilled artisans would have been unable to modify" the prior art to achieve the claimed invention); *Leo Pharms.*, 2013 WL 4054937, at *10. In fact, Schantz negates any reason to combine or "reasonable expectation of success" the skilled artisan might have for using the uncomplexed toxin in a human medical application, as distinct from the animal paralysis studies of the prior art.

It will be no answer for the PTO to argue that the Board's conclusion of obviousness can be saved on the ground that its factual findings need only be supported by "substantial evidence" or that teaching away is a question of fact. The real issue here is the proper application of obviousness law to the undisputed content of the prior art—a subject on which this Court exercises *de novo* review. *See, e.g.*, *Leo Pharm. Prods.*, 2013 WL 4054937, at *10 (acknowledging the "substantial evidence" standard but explaining that "[i]n this case, however, with no material factual disputes, this court cannot share the Board's analysis and application of the law to those facts."). The PTO's rejections cannot stand under the proper legal analysis of obviousness. That said, to the extent any factual issues remain, the plain language of Schantz demonstrates the Board's views are not supported by substantial evidence.

**CONCLUSION**

For the reasons explained above, this Court should reverse the Board's obviousness finding and, as there are no other remaining bases of rejection, remand with instructions for the agency to issue the claims on appeal as a United States patent.

Dated: September 30, 2013

Respectfully submitted,

/s/*Craig E. Countryman*
Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

*Attorney for Appellants,*
Kei Roger Aoki, Michael W. Grayston,
Steven R. Carlson, and Judith M. Leon

# ADDENDUM



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/461,829 | 06/12/2003 | Kei Roger Aoki | 16952-CON1-CIP1 | 6671 |

51957 7590 04/30/2013
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER | |
|---|---|
| GUPTA, ANISH | |
| **ART UNIT** | **PAPER NUMBER** |
| 1654 | |
| **NOTIFICATION DATE** | **DELIVERY MODE** |
| 04/30/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents_ip@allergan.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* KEI ROGER AOKI, MICHAEL W. GRAYSTON, STEVEN R. CARLSON, and JUDITH M. LEON

---

Appeal 2013-002185
Application 10/461,829
Technology Center 1600

---

Before TONI R. SCHEINER, LORA M. GREEN, and STEPHEN WALSH, *Administrative Patent Judges*.

SCHEINER, *Administrative Patent Judge*.

DECISION ON APPEAL

This is an appeal under 35 U.S.C. § 134 from the final rejection of claims 2, 4-6, 16, 17, 24, and 25, directed to a method for treating blepharospasm by administering the neurotoxic component of a botulinum toxin. The claims have been rejected as obvious. We have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

STATEMENT OF THE CASE

Claim 2 is representative of the subject matter on appeal:

2. A method for treating blepharospasm, wherein said method is a human medical application and comprises the step of administering to a human patient a therapeutically effective amount of the neurotoxic component from a single serotype of a botulinum toxin, to thereby treat the blepharospasm, wherein the neurotoxic component administered to the patient has a molecular weight of about 150 kilodaltons.

The Examiner relies on the following evidence:

| Borodic | US 5,183,462 | Feb. 2, 1993 |
|---|---|---|

Chun K. Tse et al., *Preparation and Characterization of Homogeneous Neurotoxin Type A from Clostridium botulinum*, 122 EUR. J. BIOCHEM. 493-500 (1982).

In addition, Appellants rely on the following evidence:

Edward J. Schantz & Eric A. Johnson, *Properties and Use of Botulinum Toxin and Other Microbial Neurotoxins in Medicine*, 56 MICROBIOLOGICAL REVIEWS 80-99 (1992).

C. Lamanna et al., *Cardiac Effects of Botulinal Toxin*, 293 ARCH. INT. PHARMACODYN. THER. 69-83 (1988) ("Lamanna 1988").

Carl Lamanna, *Thoughts on action of botulinum toxin suggested by reversibility of heart effects*, *in* BOTULINUM AND TETANUS NEUROTOXINS 333-335 (Bibhuti R. DasGupta ed., 1993) ("Lamanna 1993").

Declaration of Dr. Leonard A. Smith, dated November 20, 2007, and submitted under the provisions of 37 C.F.R. § 1.132 ("Decl. I").

Declaration of Dr. Leonard A. Smith, dated May 25, 2011, and submitted under the provisions of 37 C.F.R. § 1.132 ("Decl. II").

Declaration of Dr. Leonard A. Smith, dated December 16, 2011, and submitted under the provisions of 37 C.F.R. § 1.132 ("Decl. III").

Claims 2, 4-6, 16, 17, 24, and 25 stand rejected under 35 U.S.C. § 103(a) as unpatentable over Borodic in view of Tse et al.

We affirm.

ISSUE

Has the Examiner established that treating blepharospasm by administering the neurotoxic component of a botulinum toxin, rather than a complexed form of the botulinum toxin, would have been obvious over the evidence of record?

FINDINGS OF FACT

1. Borodic discloses treatment of bilateral blepharospasm in humans with botulinum toxin, wherein "a starting dose totaling 10 to 20 IU is injected at 4 to 6 sites in the upper and lower eyelid of each eye" (Borodic, col. 2, ll. 9-14), and "[t]he degree of weakening from denervation can be 'titrated' empirically for particular patients by altering the dose" (*id.* at col. 2, ll. 28-30). There is no dispute that the botulinum toxin disclosed by Borodic is in the form of a haemagglutinin-neurotoxin complex.

2. Tse describes removal of the immunogenic haemagglutinin component of the type A haemagglutinin-neurotoxin complex, and characterization of the isolated, purified 150 kD neurotoxic component (Tse 493, col. 2; 494, cols. 1-2; 496, col. 2; 499, col. 2).

3. According to Tse, "[w]hen this neurotoxin (5 mouse $LD_{50}$ units; 60 pg protein) was injected into rat hind-leg muscle, it produced local paralysis within 24 h" (Tse 498, col. 1). In addition, "[a]s clearly demonstrated with impure neurotoxin complexes, pure neurotoxin specifically and characteristically inhibited stimulated and spontaneous release of acetylcholine at the vertebrate neuromuscular junction" (*id.* at 499, col. 2 (internal citations omitted)).

4. Schantz discusses the properties of botulinum toxins, including the purified neurotoxic component. According to Schantz:

> The nontoxic proteins bound to the neurotoxin apparently play an important role in maintaining the toxic shape of the neurotoxin. Careful handling of purified toxin is therefore important for maintenance of stability. Botulinum toxin type A is readily denatured by heat at temperatures above 40°C, particularly at alkaline pH. Solutions of the toxin lose toxicity when bubbles form at the air/liquid interface causing stretching and pulling of the neurotoxin out of its toxic shape. This denaturation also takes place in an atmosphere of nitrogen or carbon dioxide. Dilution to extremely low concentrations (nanograms per milliliter) also tends to decrease the stability of the neurotoxin, but this can be prevented by diluting with a buffered solution (at pH 6.8 or below) containing another protein such as gelatin and certain albumins such as bovine or human serum albumin. When the pH is raised above 7.3, the neurotoxin is liberated, which is very labile. Because of its lability the neurotoxin is not practical for medical applications.

(Schantz 82, col. 2 (internal citations omitted).)

> Most recent information concerning the structure and pharmacology of botulinum toxin has been obtained with purified neurotoxins, but it is unlikely that these will be used in a clinical setting. The toxin complexes are much more stable than neurotoxins and can be diluted and formulated with retention of toxicity. Pure neurotoxins can be kept for several weeks to months in solution in the cold but are inactivated on dilution, formulation, and drying.

(*Id.* at 89, col. 2.)

5. Schantz teaches that purified botulinum neurotoxins "have high specific toxicities" (Schantz 87, col. 2), and are capable of producing paralysis in rats (*id.* at 89, col. 2).

6. Lamanna 1988 discloses "a purified sample of type A toxin free of hemagglutinin . . . dissolved in a sterilized phosphate-0.2% gelatin buffer (pH 6.2-6.7) for storage and i.v. injection" into mice, rats, and dogs (Lamanna 70). "[H]emagglutinin-free toxin had the same qualitative effects

on the heart" as hemagglutinin-containing (i.e., complexed) toxin, but was more potent than the hemagglutinin-containing toxin on a weight to weight basis (*id.* at 72).

DISCUSSION

The Examiner finds that Borodic discloses treating blepharospasm in humans with haemagglutinin-complexed botulinum toxin, but "does not teach the use of the [150 kilodalton] neurotoxin component of botulinum toxin" (Ans. 2).

However, the Examiner finds that Tse discloses that the neurotoxic component of type A botulinum "specifically and characteristically inhibited stimulated and spontaneous release of acetylcholine at the vertebrate neuromuscular junction" (*id.* at 3) in the same manner as the complexed toxin, and also, "when injected into the hind leg muscle of a rat, produced local paralysis within 24 hours" (*id.*).

The Examiner concludes that it would have been obvious for one of ordinary skill in the art "to use pure neurotoxin for the treatment of blepharospasm [in humans] because pure neurotoxin has similar activity in the paralysis of muscles" (*id.* at 3, 8).

Appellants contend that "a person having ordinary skill in the art reading the Schantz reference would clearly have been discouraged from using the neurotoxic component for human therapeutic purposes" (App. Br. 8), given Schantz's "plain, express language" (*id.*). Specifically, Appellants argue that the following statements in Schantz teach away from the claimed method:

> Because of its lability the neurotoxin <u>is not practical for medical applications</u>.

(Schantz 82, col. 2; App. Br. 8 (emphasis Appellants').)

> Most recent information concerning the structure and pharmacology of botulinum toxin has been obtained with purified neurotoxins, but it is unlikely that these will be used in clinical settings. The toxin complexes are much more stable than neurotoxin and can be diluted and formulated with retention of toxicity. Pure neurotoxins can be kept for several weeks to months in solution in the cold but are inactivated on dilution, formulation, and drying.

(Schantz 89, col. 2; App. Br. 8 (emphasis Appellants').)

Appellants' argument is supported by declarant Dr. Leonard A. Smith, whose work "has involved production, formulation, and characterization of native botulinum toxin and recombinant neurotoxin component fragments" (Decl. I, ¶ 9). Dr. Smith concludes that "a person having ordinary skill in the art reading Schantz 1992 and considering the Tse *at al.* reference . . . with or without consideration of the Lamanna [1988 and 1993] references clearly would have been discouraged from using the neurotoxic component for human therapeutic purposes" based, at least in part, on the statements quoted above (Decl. III, ¶ 4).[1]

---

[1] The Lamanna 1988 reference is relied on by Appellants as evidence that "mice, rats, rabbits and dogs . . . were intravenously injected with identical storage stable formulations of both the botulinum toxin complex . . . and the neurotoxin component . . . both . . . dissolved in a sterilized phosphate-02% gelatin buffer (pH 6.2-6.7) for storage and i.v. injection" (Decl. I, ¶ 15(c)). The Lamanna 1993 reference cites Lamanna 1988, and is relied on by Appellants as evidence that "after the March 1992 publication date of Schantz but before the December 1993 filing date of the [present application's parent application serial no. 08/173,996] it was known that a storage stable formulation of the neurotoxic component could be administered to various mammal species with physiological effect." (Decl. I, ¶ 15(c).)

According to Dr. Smith, a person of ordinary skill in this art "would have been well aware of Dr. Schantz's recognized accomplishments [in developing this field], . . . [and] also would have appreciated that the Schantz 1992 reference is much more authoritative and influential than prior art such as the Tse *et al.* reference and the Lamanna references" (Decl. III, ¶ 6). Dr. Smith notes that Schantz "specifically cites the Tse *et al.* reference as reference number 222 and the 1988 Lamanna *et al.* reference as reference number 114" and concludes that

> [A]nyone weighing the discouraging statements in Schantz 1992 against any possible conflicting teachings from the Tse *et al.* reference would have concluded that Schantz 1992 is much more authoritative for the simple fact that the authors of Schantz 1992 already considered the teachings from these references when they concluded that "the neurotoxin is not practical for medical applications" and that it is unlikely that the neurotoxin "will be used in a clinical setting." In other words, it is completely illogical to me to think that a person having ordinary skill in the art considering the teachings of the Tse *et al.* reference, the 1988 Lamanna *et al.* reference, and Schantz 1992, as the authors of Schantz 1992 already did, would have arrived at any conclusion different than those of the authors of Schantz 1992 - namely that "the neurotoxin is not practical for medical applications" and that it is unlikely that the neurotoxin "will be used in a clinical setting."

(Decl. III, ¶ 7.)

"[W]eight ought to be given to a persuasively supported statement of one skilled in the art on what was not obvious to him." *In re Lindell*, 385 F.2d 453, 456 (CCPA 1967). Accordingly, we have carefully considered Dr. Smith's Declarations. However, we do not agree that Schantz teaches away from substituting the neurotoxic component of botulinum toxin for the haemagglutinin-complexed form of the toxin in Borodic's method of treating

blepharospasm. That is, we do not agree that anything in Schantz would have led one of ordinary skill in the art to expect that the purified neurotoxin would be ineffective in treating blepharospasm, as there is ample evidence of record that the complexed toxin and the purified neurotoxic component both produce the desired effect - local paralysis (FFs 3, 5), and both operate by the same mechanism (FF3). While we agree that one of ordinary skill in the art would have concluded from the Schantz reference that the purified toxin is impractical in comparison with the complexed toxin, Schantz also teaches that the purified neurotoxin can be stored for weeks in the cold, and can be successfully diluted with careful buffering and handling (FF4) - which, we venture to say, is the case for many therapeutic agents.

"When prior art contains apparently conflicting references, the Board must weigh each reference for its power to suggest solutions to an artisan of ordinary skill." *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991). Moreover,

> Although a reference that teaches away is a significant factor to be considered in determining unobviousness, the nature of the teaching is highly relevant, and must be weighed in substance. A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.

*In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

When we consider the Schantz reference as a whole, together with the Borodic and Tse references, we are not persuaded that one of ordinary skill in the art would have been dissuaded from substituting the neurotoxic component of botulinum toxin for the larger, more immunogenic haemagglutinin-complexed form of the toxin in Borodic's method of treating blepharospasm.

## SUMMARY

The Examiner has established that treating blepharospasm by administering the neurotoxic component of a botulinum toxin, rather than a complexed form of the botulinum toxin, would have been obvious over the evidence of record.

The rejection of claims 2, 4-6, 16, 17, 24, and 25 as unpatentable over Borodic in view of Tse is affirmed.

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a).

AFFIRMED

dm

## CERTIFICATE OF SERVICE AND FILING

I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system. Counsel was served via CM/ECF.

Mr. Daniel E. O'Toole
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W., Room 401
Washington, D.C. 20439
Tel: 202.275.8000
Fax: 202.275.9678

*Clerk of Court*

Nathan K. Kelley, Esq.
Frances M. Lynch, Esq.
Coke M. Stewart, Esq.
U.S. Patent & Trademark Office
Mail Stop 8, P. O. Box 1450
Alexandria, VA 22313-1450
Tel: 571.272.9035
Fax: 571.273.0373
Email: nathan.kelley@uspto.gov
frances.lynch@uspto.gov
coke.stewart@uspto.gov

*Attorneys for Appellee David J. Kappos*

/s/ *Craig E. Countryman*
Craig E. Countryman

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that Appellants' Opening Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contain 6,725 words, as determined by Microsoft Word.

Dated: September 30, 2013

/s/Craig E. Countryman
Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

*Attorney for Appellants,*
Kei Roger Aoki, Michael W. Grayston,
Steven R. Carlson, and Judith M. Leon